**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**AT COVINGTON**

| | |
|---|---|
| CAMPBELL COUNTY AUTO BODY, INC., | Civil Action No. _____ |
| Plaintiff, | |
| **v.** | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, STATE FARM FIRE AND CASUALTY COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, SAFECO INSURANCE COMPANY OF AMERICA, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE INSURANCE COMPANY, ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, PROGRESSIVE DIRECT INSURANCE COMPANY, PROGRESSIVE CASUALTY INSURANCE COMPANY, PROGRESSIVE PREFERRED INSURANCE COMPANY, PROGRESSIVE ADVANCED INSURANCE COMPANY, UNITED SERVICES AUTOMOBILE ASSOCIATION, USAA CASUALTY INSURANCE COMPANY, USAA GENERAL INDEMNITY COMPANY, GEICO CASUALTY COMPANY, GEICO GENERAL INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GOVERNMENT EMPLOYEES INSURANCE COMPANY, NATIONWIDE INSURANCE COMPANY OF AMERICA, NATIONWIDE MUTUAL INSURANCE COMPANY, NATIONWIDE AFFINITY INSURANCE COMPANY OF AMERICA, STATE AUTO PROPERTY & CASUALTY INSURANCE COMPANY, STATE AUTOMOBILE MUTUAL INSURANCE COMPANY, SHELTER MUTUAL INSURANCE COMPANY, SHELTER GENERAL INSURANCE COMPANY, GRANGE MUTUAL CASUALTY COMPANY, GRANGE PROPERTY & CASUALTY INSURANCE COMPANY, THE TRAVELERS HOME AND MARINE INSURANCE COMPANY, TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY | **COMPLAINT** |

INSURANCE COMPANY OF AMERICA, THE
TRAVELERS INDEMNITY COMPANY OF
CONNECTICUT, METROPOLITAN CASUALTY
INSURANCE COMPANY, METROPOLITAN
DIRECT PROPERTY AND CASUALTY
INSURANCE COMPANY, METROPOLITAN
PROPERTY AND CASUALTY INSURANCE
COMPANY, AUTO-OWNERS INSURANCE
COMPANY, CINCINNATI INSURANCE
COMPANY, and SAFE AUTO INSURANCE
COMPANY,

                          Defendants.

Plaintiff Campbell County Auto Body, Inc., by and through undersigned counsel, files this

Complaint for violation of the laws stated herein against defendants State Farm Mutual

Automobile Insurance Company, State Farm Fire and Casualty Company, Liberty Mutual

Insurance Company, Liberty Mutual Fire Insurance Company, SAFECO Insurance Company of

America, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate

Insurance Company, Allstate Property and Casualty Insurance Company, Progressive Direct

Insurance Company, Progressive Casualty Insurance Company, Progressive Preferred Insurance

Company, Progressive Advanced Insurance Company, United Services Automobile Association,

USAA Casualty Insurance Company, USAA General Indemnity Company, GEICO Casualty

Company, GEICO General Insurance Company, GEICO Indemnity Company, Government

Employees Insurance Company, Nationwide Insurance Company of America, Nationwide Mutual

Insurance Company, Nationwide Affinity Insurance Company of America, State Auto Property &

Casualty Insurance Company, State Automobile Mutual Insurance Company, Shelter Mutual

Insurance Company, Shelter General Insurance Company, Grange Mutual Casualty Company,

Grange Property & Casualty Insurance Company, The Travelers Home and Marine Insurance

Company, Travelers Property Casualty Company of America, Travelers Casualty and Surety

Company of America, Travelers Casualty Insurance Company of American, The Travelers Indemnity Company of Connecticut, Metropolitan Casualty Insurance Company, Metropolitan Direct Property and Casualty Insurance Company, Metropolitan Property and Casualty Insurance Company, Auto-Owners Insurance Company, Cincinnati Insurance Company, (collectively, "Defendants") and Safe Auto Insurance Company, hereby alleges, on information and belief, except for information identified as being based on personal knowledge, which allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, as follows:

## PARTIES

1.     Plaintiff Campbell County Auto Body, Inc., is a Kentucky corporation with its principle place of business in Cold Springs, KY and is authorized to transact auto collision business in the State of Kentucky.

2.     Defendant State Farm Mutual Automobile Insurance Company is an Illinois insurance company with its principle place of business in Bloomington, IL. Defendant State Farm Mutual Automobile Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant State Farm Mutual Automobile Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

3.     Defendant State Farm Fire and Casualty Company is an Illinois insurance company with its principle place of business in Bloomington, IL. Defendant State Farm Fire and Casualty Company is registered with the Kentucky Department of Insurance and is licensed to do business

and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant State Farm Fire and Casualty Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

4.     Defendant Liberty Mutual Insurance Company is a Massachusetts insurance company with its principle place of business in Boston, MA. Defendant Liberty Mutual Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Liberty Mutual Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

5.     Defendant Liberty Mutual Fire Insurance Company is a Wisconsin insurance company with its principle place of business in Wausau, WI. Defendant Liberty Mutual Fire Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Liberty Mutual Fire Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

6.     Defendant SAFECO Insurance Company of America is a New Hampshire insurance company with its principle place of business in Keene, NH. Defendant SAFECO Insurance Company of America is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230. Defendant SAFECO Insurance Company of America may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

7.      Defendant Allstate Fire and Casualty Insurance Company is an Illinois insurance company with its principle place of business in Northbrook, IL. Defendant Allstate Fire and Casualty Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Allstate Fire and Casualty Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

8.      Defendant Allstate Indemnity Company is an Illinois insurance company with its principle place of business in Northbrook, IL. Defendant Allstate Indemnity Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Allstate Indemnity Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

9.      Defendant Allstate Insurance Company is an Illinois insurance company with its principle place of business in Northbrook, IL. Defendant Allstate Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Allstate Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

10.     Defendant Allstate Property and Casualty Insurance Company is an Illinois insurance company with its principle place of business in Northbrook, IL. Defendant Allstate Property and Casualty Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky.

Pursuant to K.R.S. § 304.4-230, Defendant Allstate Property and Casualty Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

11.     Defendant Progressive Direct Insurance Company is an Ohio insurance company with its principle place of business in Cleveland, OH. Defendant Progressive Direct Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Progressive Direct Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

12.     Defendant Progressive Casualty Insurance Company is an Ohio insurance company with its principle place of business in Cleveland, OH. Defendant Progressive Casualty Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Progressive Casualty Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

13.     Defendant Progressive Preferred Insurance Company is an Ohio insurance company with its principle place of business in Cleveland, OH. Defendant Progressive Preferred Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Progressive Preferred Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

14.     Defendant Progressive Advanced Insurance Company is an Ohio insurance company with its principle place of business in Mayfield, OH. Defendant Progressive Advanced Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant  Progressive Advanced Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

15.     Defendant United Services Automobile Association is a Texas insurance company with its principle place of business in San Antonio, TX. Defendant United Services Automobile Association is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant United Services Automobile Association may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

16.     Defendant USAA Casualty Insurance Company is a Texas insurance company with its principle place of business in San Antonio, TX. Defendant USAA Casualty Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant USAA Casualty Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

17.     Defendant USAA General Indemnity Company is a Texas insurance company with its principle place of business in San Antonio, TX. Defendant USAA General Indemnity Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant USAA General

Indemnity Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

18.     Defendant GEICO Casualty Company is a Maryland insurance company with its principle place of business in Chevy Chase, MD. Defendant GEICO Casualty Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant GEICO Casualty Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

19.     Defendant GEICO General Insurance Company is a Maryland insurance company with its principle place of business in Chevy Chase, MD. Defendant GEICO General Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant GEICO General Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

20.     Defendant GEICO Indemnity Company is a Maryland insurance company with its principle place of business in Chevy Chase, MD. Defendant GEICO Indemnity Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant GEICO Indemnity Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

21.     Defendant Government Employees Insurance Company is a Maryland insurance company with its principle place of business in Chevy Chase, MD. Defendant Government

Employees Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Government Employees Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

22.     Defendant Nationwide Insurance Company of America is a Wisconsin insurance company with its principle place of business in Madison, WI. Defendant Nationwide Insurance Company of America is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Nationwide Insurance Company of America may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

23.     Defendant Nationwide Mutual Insurance Company is an Ohio insurance company with its principle place of business in Columbus, OH. Defendant Nationwide Mutual Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Nationwide Mutual Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

24.     Defendant Nationwide Affinity Insurance Company of America is an Ohio insurance company with its principle place of business in Columbus, OH. Defendant Nationwide Affinity Insurance Company of America is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Nationwide Affinity Insurance Company of America may be

served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

25.     Defendant State Auto Property & Casualty Insurance Company is an Iowa insurance company with its principle place of business in West Des Moines, IA. Defendant State Auto Property & Casualty Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant State Auto Property & Casualty Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

26.     Defendant State Automobile Mutual Insurance Company is an Ohio insurance company with its principle place of business in Columbus, OH. Defendant State Automobile Mutual Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant State Automobile Mutual Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

27.     Defendant Shelter Mutual Insurance Company is a Missouri insurance company with its principle place of business in Columbia, MO. Defendant Shelter Mutual Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Shelter Mutual Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

28.     Defendant Shelter General Insurance Company is a Missouri insurance company with its principle place of business in Columbia, MO. Defendant Shelter General Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Shelter General Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

29.     Defendant Grange Mutual Casualty Company is an Ohio insurance company with its principle place of business in Columbus, OH. Defendant Grange Mutual Casualty Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Grange Mutual Casualty Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

30.     Defendant Grange Property & Casualty Insurance Company is an Ohio insurance company with its principle place of business in Columbus, OH. Defendant Grange Property & Casualty Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Grange Property & Casualty Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

31.     Defendant The Travelers Home and Marine Insurance Company is a Connecticut insurance company with its principle place of business in Hartford, CT. Defendant The Travelers Home and Marine Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to

K.R.S. § 304.4-230, Defendant The Travelers Home and Marine Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

32.     Defendant Travelers Property Casualty Company of America is a Connecticut insurance company with its principle place of business in Hartford, CT. Defendant Travelers Property Casualty Company of America is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Travelers Property Casualty Company of America may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

33.     Defendant Travelers Casualty and Surety Company of America is a Connecticut insurance company with its principle place of business in Hartford, CT. Defendant Travelers Casualty and Surety Company of America is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Travelers Casualty and Surety Company of America may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

34.     Defendant Travelers Casualty Insurance Company of America is a Connecticut insurance company with its principle place of business in Hartford, CT. Defendant Travelers Casualty Insurance Company of America is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Travelers Casualty Insurance Company of America may be served

with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

35.     Defendant The Travelers Indemnity Company is a Connecticut insurance company with its principle place of business in Hartford, CT. Defendant The Travelers Indemnity Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant The Travelers Indemnity Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

36.     Defendant Metropolitan Casualty Insurance Company is a Rhode Island insurance company with its principle place of business in Warwick, RI. Defendant Metropolitan Casualty Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Metropolitan Casualty Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

37.     Defendant Metropolitan Direct Property and Casualty Insurance Company is a Rhode Island insurance company with its principle place of business in Warwick, RI. Defendant Metropolitan Direct Property and Casualty Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Metropolitan Direct Property and Casualty Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

38.     Defendant Metropolitan Property and Casualty Insurance Company is a Rhode Island insurance company with its principle place of business in Warwick, RI. Defendant Metropolitan Property and Casualty Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Metropolitan Property and Casualty Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

39.     Defendant Auto-Owners Insurance Company is a Michigan insurance company with its principle place of business in Lansing, MI. Defendant Auto-Owners Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Auto-Owners Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

40.     Defendant Cincinnati Insurance Company is an Ohio insurance company with its principle place of business in Fairfield, OH. Defendant Cincinnati Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Cincinnati Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

41.     Defendant Safe Auto Insurance Company is an Ohio insurance company with its principle place of business in Columbus, OH. Defendant Safe Auto Insurance Company is registered with the Kentucky Department of Insurance and is licensed to do business and is doing

business within the State of Kentucky. Pursuant to K.R.S. § 304.4-230, Defendant Safe Auto Insurance Company may be served with process through the Kentucky Secretary of State, 700 Capital Ave., Ste. 86, Frankfort, KY 40601.

## JURISDICTION AND VENUE

42.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise under the Sherman Acts, 15 U.S.C. §§ 1. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

43.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this judicial district.

44.     Plaintiff demands a jury trial on all issues triable by jury in this matter.

## FACTS

45.     Plaintiff is in the business of recovery and/or repair of motor vehicles involved in collisions.

46.     Each individual Defendant is an insurer providing automobile policies to consumers throughout the State of Kentucky, including insureds and claimants having repairs, or who sought to have repairs, performed by Plaintiff located within the State of Kentucky.

47.     Plaintiff has done business at various times over the course of years with the Defendants' policyholders and claimants by providing to these policyholders and claimants motor vehicle collision repair service. Each Defendant is individually responsible for payment for those repairs for their respective policyholders and claimants.

48.     Over the course of several years, the Defendants have engaged in an ongoing, concerted and intentional course of action and conduct with Defendants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively, "State Farm") acting as the spearhead to improperly and illegally control and depress automobile damage repair costs to the detriment of Plaintiff and the substantial profit of the Defendants.

49.     One of the methods by which the Defendants exert control over body shops is by way of entering program agreements with individual body shops. Although each Defendant's program agreements have unique titles, such agreements are known generally and generically within the collision repair industry as direct repair programs ("DRPs").

50.     DRPs are presented to body shops as a mutually beneficial opportunity. In exchange for providing certain concessions of price, priority and similar matters, the Defendants would list a body shop as a preferred provider.

51.     However, the concessions demanded by the Defendants in exchange for remaining on a direct repair program were not balanced by purported benefits.  The Defendants, particularly State Farm, have utilized these agreements to exert control over Plaintiff's business in a variety of manners, well beyond that of an ordinary business agreement. This control even extends to and is applied upon body shops without DRPs, including Plaintiff.

52.     Defendants, particularly State Farm, have engaged in an ongoing pattern and practice of coercion and implied threats to Plaintiff's pecuniary health in order to force compliance with unreasonable and onerous concessions. Failure to comply results in improper steering of customers away from Plaintiff's businesses and/or simply punishment to decrease the number of customers utilizing Plaintiff's services.

53.     According to the National Association of Insurance Commissioners' 2012 Market Share Report, State Farm captured 22.30% of the private passenger automobile insurance business within Kentucky.

54.     Collectively, the Defendants accounted for more than 65% of the private passenger insurance market in Kentucky in 2012. *See* Exhibit 1, 2012 Kentucky Market Share and Loss Ratio.

55.     Based upon the most recent information available, it is clear that State Farm holds the dominant position within the automobile insurance industry in the Kentucky market.

56.     The majority of Plaintiff's business is generated by customers for whom the Defendants are responsible to pay repair costs. The insurance-paying customers currently account for approximately sixty percent of Plaintiff's revenue. Courts have acknowledged the significant role played by insurance companies in funding automobile collision repairs, as well as the ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repairs. See, e.g., *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006) (*aff'd*, *Allstate ins. co. v. Abbott,* 2007 U.S. App. LEXIS 18336 (5th Cir. 2007).

57.     As a general proposition, each DRP contains a general statement that the body shop will charge the respective insurance company no more for any particular repair than is the going market rate in the market area. However, body shops, including Plaintiff, are not permitted to set their own rates.

58.     State Farm utilizes "surveys" to establish a "market rate." The geographical boundaries of the market area for the surveys are wholly within the control and direction of State Farm.

59.     Under the terms of its DRP, State Farm is not required to disclose any of the methods by which it establishes the market area, the market rate, or any other factual bases for its determination of the "market rate." The agreement contains no provisions for independent and neutral verification of the data utilized, nor any oversight not directly within the control and direction of State Farm. The shops, regardless of whether it is a DRP shop, are simply required to blindly accept State Farm's pronouncements regarding these matters.

60.     Previously State Farms' survey was conducted by sending written documents to the individual body shops. The owner or designated representative of the body shop would fill out the survey and return it to State Farm. In recent years, this process has been transferred to an electronic forum, State Farm's Business to Business portal, whereby the body shops go online to complete the survey.

61.     State Farm does not perform a survey in the traditional scientific sense, where information is obtained and results produced, establishing a baseline of all the body shops' information. With respect to labor rates, for example, State Farm's methodology does not represent what the majority of shops in a given area charge. Quite the contrary: State Farm's methodology lists the shops in a given market (as determined by State Farm) with the highest rates submitted at the top of the list and descending to the least expensive hourly rates at the bottom.

62.     State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser. Those are then totaled and State Farm employs it's "half plus one" method. If, for example, a State Farm determined market area has a total of fifty (50) technicians or work bays, State Farm's "half plus one" math equals twenty-six (26). With that number, starting at the bottom of the shop list, State Farm counts each shops' technicians or work

bays until the "half plus one" number is reached—twenty-six in this example—and whatever that shop's rate happens to be is declared the market rate.

63.     There could, arguably, be some validity to this method if it accounted for the variance in shop size, skill of technicians and other quality variables; however, it does not.  The greatest problem with this method is that State Farm can and does alter the labor rates that the body shops input, decreasing those arbitrarily deemed too high or higher than State Farm wishes to pay.

64.     By altering the rates entered, particularly those of the larger shops (*i.e.*, those with the most technicians and/or work bays), State Farm manipulates the results to achieve a wholly artificial "market rate." The results are therefore not that of an actual survey reflecting the designated market area but created from whole cloth by State Farm, particularly since State Farm determines the market area to be included.

65.     Furthermore, State Farm attempts to prohibit the shops from discussing with each other the information each has entered into the survey, asserting any discussion may constitute illegal price fixing. Meanwhile, State Farm selects the geographical boundaries of the survey, retains the right to alter the survey results and does, in fact, alter the survey results.  All without disclosure or oversight.

66.     Another electronic page on State Farm's business portal is known as the Dashboard/Scorecard.  An exemplar of State Farm's Dashboard is attached hereto as Exhibit 2.

67.     The Dashboard has substantive impact on several levels. It serves as the record of an individual shop's survey responses. It also provides a "report card" and rating of the individual shop based primarily upon three criteria: quality, efficiency and competitiveness.

68.     Within the quality criterion, the shop's reported customer satisfaction, customer complaints, and quality issues identified by an audit are scored.

69.     The efficiency criterion evaluates repair cycle time, number of days a vehicle is in the shop, utilizing information input by the shops on the car's drop-off and pickup dates.

70.     The competitiveness criterion analyzes the average estimate for each State Farm repair, the cost of parts, whether a vehicle is repaired or replacement parts are utilized, the number of hours required to complete repair and similar matters. *See, e.g.,* Exhibit 2, at 1-2.

71.     In rating an individual shop, a total score of 1000 is possible. But State Farm is under no obligation to disclose the weight or total number of points possible given to each factor included in reaching the score, particularly those factors included under the competitiveness criterion. In fact, State Farm has refused to disclose its method of determining competitiveness even to its own team leaders.

72.     Due to this opacity, State Farm maintains complete and unsupervised authority to determine an individual shop's rating. It is therefore possible for a shop to have no customer complaints, high customer satisfaction, no issues identified on an audit, complete compliance with all repair cycle time and efficiency expectations and yet still have a low rating.  It is also possible for a shop to have multiple customer complaints, poor customer satisfaction, numerous issues identified on audit and complete failure to meet efficiency expectations and yet have a very high rating.

73.     The Dashboard rating is very important as a shop's rating determines its position on the list of preferred providers. When a customer logs on to the State Farm website seeking a repair shop, those shops with the highest ratings are displayed first. A shop with a low rating will

be at the bottom of the list often pages and pages down, making it difficult for a potential customer to find it. If a customer calls State Farm, the representative provides the preferred shops beginning with those holding the highest rating.

## SUPPRESSION OF LABOR RATES

74.     State Farm's survey includes questions regarding, *inter alia*, the individual shop's hourly labor rate. The individual shops are supposed to provide accurate information to allow State Farm to calculate the market rate. For example, State Farm asked Plaintiff to perform a market labor rate survey in April 2014. The actual method of determining a market rate is described above.

75.     If the labor rate information received is unilaterally deemed unacceptable by State Farm, a State Farm representative will contact the shop and demand the labor rate be lowered to an amount State Farm wishes to pay.

76.     If the body shop advises that a labor rate increase is required, State Farm representatives will inform the body shop they are the only shop in the area who has raised its rates, therefore the higher rate does not conform to the "market rate" and State Farm will refuse to pay the requested rate.

77.     At various points in time, State Farm has utilized this method of suppressing labor rates, telling each shop they are the only one to demand a higher labor rate when, in fact, multiple shops have attempted to raise their labor rates and advised State Farm of such. By threatening shops with antitrust allegations, State Farm attempts to prevent shops from learning they are not the only shop seeking to raise its rates and thus exposing State Farm's falsehoods and manipulation.  State Farm does not publish or otherwise make publicly available its survey results or the "market rate" it elects to pay.

78.     Should a shop persist in its efforts to raise its labor rate, State Farm will take one or more of several "corrective" measures. For example, State Farm agents have gone into the individual shop's survey responses and altered the labor rate listed without the knowledge or consent of the shop and used this lowered rate to justify its determination of the "market rate." State Farm has threatened to remove the shop from the direct repair program to coerce compliance. State Farm has removed shops from the direct repair program for not reducing their labor rates.

79.     The net effect of this tactic is to allow State Farm to manipulate the "market rate" and artificially suppress the labor rate for the relevant geographic area. An area, which, again, is defined solely by State Farm and is not subject to either neutral verification or even disclosure. This artificially created "market rate" is the maximum that will be paid, whether or not a given shop is a DRP shop.

80.     The remaining Defendants, intentionally and by agreement and/or conscious parallel behavior, specifically advised Plaintiff they will pay no more than what State Farm pays for labor. The Defendants have not conducted any surveys of their own in which Plaintiff has participated to determine market rates. The Defendants have agreed to join forces with State Farm, the dominant market holder, and each other to coerce Plaintiff into accepting the artificially created less-than-market labor rates through intimidation and threats to Plaintiff's financial ability to remain operating.

81.     Additionally, these payment ceilings are enforced across the board by all Defendants. Whether or not a shop is a member of a DRP, any DRP, is irrelevant. Defendants enforce the self-interested, artificially created rates against all shops, simply refusing to pay any

more than they choose while explaining it away as "market rate." For example, Mark Roberts, a State Farm employee, informed Plaintiff that State Farm only pays market rates.

## SUPPRESSION OF REPAIR AND MATERIAL COSTS

82.     Through various methods, the Defendants have, independently and in concert, instituted numerous methods of coercing Plaintiff into accepting less than actual and/or market costs for materials and supplies expended in completing repairs.

83.     Some of these methods include, but are not limited to: (1) refusal to compensate the shops for replacement parts when repair is possible though strongly recommended against based upon the shop's professional opinion; (2) utilizing used and/or recycled parts rather than new parts, even when new parts are available and a new part would be the best and highest quality repair to the vehicle; (3) requiring discounts and/or concessions be provided, even when doing so requires the shop to operate at a loss; and (4) *de facto* compulsory utilization of parts procurement programs.

84.     In addition to the above, the Defendants have repeatedly and intentionally failed to abide by minimum industry standards for auto repairs.

85.     Three leading collision repair estimating databases are in ordinary usage within the auto body collision repair industry: ADP, CCC, and Mitchell.

86.     These databases provide software and average costs associated with particular types of repairs to create estimates. The estimates that these databases generate include the ordinary and customary repairs, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition. These databases and the estimates they generate are accepted within the industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability

between the "best-case scenario"[1] presented by the procedure databases and the actual needs of a particular repair.

87.     Over the course of years, the Defendants have admitted the accepted position of the estimating databases within the industry, but have nonetheless engaged in a course of conduct of refusing to make full payment for procedures and materials. Each of the Defendants have refused to allow Plaintiff to perform required procedures and processes and/or refused to pay for them, thereby requiring Plaintiff to perform less-than-quality work or suffer a financial loss.

88.     A non-exhaustive list of procedures and processes that the Defendants have refused, and continue to refuse, to pay and/or pay in full is attached hereto as Exhibit 3.

89.     At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage.  For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendants will cite the database estimate and pay for only fifteen hours of labor time.

90.     For example, upon information and belief, in June, 2014, Johnny Hurt—who holds a management position with Defendant Safeco Insurance Company of America— stated that payment according to procedures pages had been discussed just the previous week at a regional

---

[1] The database procedure pages set forth the anticipated repairs, repair times and materials for repair of an undamaged vehicle using original manufacturer equipment, which are specifically designed to fit that particular vehicle.  Wrecked cars are obviously not undamaged and original manufacturer parts are not always used, particularly with repairs that State Farm and the other Defendants are responsible for payment, which can substantially affect repair procedures required, repair times and necessary materials.

meeting and the corporate direction given was that procedure pages would only be paid when it was financially advantageous to the insurer to do so.

91.     With respect to materials, while it is inarguable that materials must be expended to repair automobile collisions, the Defendants simply refuse to pay for them, asserting materials are part of the cost of doing business. This is the Defendants' position even when the authoritative databases specifically state that such materials are not included in the repair procedure pages.

92.     The only partial exception to this practice is paint. While paint costs are factored into the amount the Defendants will pay, it is calculated via a formula which compensates the shops for only half the actual cost on average. The Defendants' method of calculating paint payment fails to account for the type of paint needed/used, the requirement that paint be mixed to match the existing color of the vehicle, the actual amount of paint required to complete the job, the type of vehicle involved or any other factor. Defendants pay only based upon arbitrary caps, self-established and unrelated to actual costs to Plaintiff.

93.     This continued refusal and/or failure to compensate Plaintiff for ordinary and customary repairs and materials costs places Plaintiff in the untenable position of either performing incomplete and/or substandard repairs and thus breaching their obligation to automobile owners to return vehicles to pre-accident condition, or performing labor and expending materials without proper compensation and thereby jeopardizing continuing viability of the business enterprise.

94.     Although occurring in Mississippi, and set forth here for illustrative purposes, it was these very concerns that prompted a meeting in April, 2013, between many of  the plaintiffs in a companion case, *Capitol Body Shop, et al v. State Farm Mutual Automobile Association*, No.

3:14CV12, Southern District of Mississippi,[2] and representatives of State Farm and the Mississippi Department of Insurance. Present on behalf of State Farm were Tim Bartlett, Estimatix team leader, John Findley, Estimatix section manager, and Steve Simkins, State Farm counsel for Mississippi and Alabama.

95.     At this meeting, members of the automobile collision repair industry expressed their dissatisfaction and concerns with the very practice of refusing to compensate fully and fairly for repairs that were performed and State Farm's inconsistent application of the database estimating software, *i.e.*, utilizing database estimates only when it is in State Farm's financial best interests to do so.

96.     State Farm's representative, Tim Bartlett, acknowledged that repairs and subsequent payment for those repairs should be consistent with the estimates prepared through the database software. Mr. Bartlett assured those present, including the Mississippi Department of Insurance representative that it would begin abiding by those database estimates and stated it would raise the matter at its insurance industry meetings, held locally approximately once a month.

97.     Also at that meeting, Mr. Simpkins asked if insurance representatives might be permitted to attend the meetings of the Mississippi collision trade association. The association representative present for the meeting, John Mosley, invited State Farm to attend those meetings if State Farm would permit members of the association to attend the insurance meetings. Mr. Simkins refused.

---

[2] This case has been transferred to the Middle District of Florida for pre-trial consolidation in Multidistrict Litigation Number 2557.

98.     Despite the assurances given the body shop representatives and the Mississippi Department of Insurance at this meeting, State Farm has failed to perform in either Mississippi or Louisiana. State Farm, and the other Defendants in collusion with State Farm, have continued to refuse to make payment and/or full payment for necessary and proper repairs, labor and materials.

99.     State Farm also imposes restrictions upon Plaintiff's ability to obtain and utilize quality replacement parts and materials. As part of its DRP agreement, State Farm asserts it has the unilateral authority to enter into separate agreements with manufacturers, distributors or suppliers of automotive parts, supplies or materials.

100.    Despite the fact that the shops have no involvement in the negotiation of those separate agreements, they are de facto required to abide by the pricing agreements reached, even if they do not make purchases with those vendors. Although presented as an option to participate, the optional language is rendered nugatory by additional language that requires the shops to accept as payment only that amount for which the parts and/or materials could have been obtained through those agreements. Participation or lack thereof is therefore completely meaningless and the optional language is illusory.

101.    Moreover, shops are required to "stack" this purportedly optional usage of separate agreements with other discounts required elsewhere within the agreement. Thus, the limitation on payment, refusal to compensate for nearly all materials and the compelled discounts end in a shop operating at or near a loss for each repair.

102.    Again, State Farm makes no distinction between DRP shops and non-DRP shops. Even the illusory promise of optional participation is absent. State Farm has enacted a widespread procedure of paying only the least amount for which a part *could* be obtained whether or not the

least expensive part is appropriate or even purchased. Thus, if a bumper *could* be purchased from a vendor somewhere for $200.00, State Farm will only pay $200.00, even if the $200.00 bumper does not fit correctly and is not used.

103.    Though led by State Farm as the dominant market share holder, all Defendants have agreed to and/or consciously parallel the compensation ceilings established by State Farm solely for their own profit.

**STEERING**

104.    The Defendants regularly and routinely engage in "steering" in order to punish the noncompliant Plaintiff shops. Through several common methods, the Defendants will "steer" insureds and/or claimants to favored, compliant shops through misrepresentation, insinuation, and casting aspersions upon the business integrity and quality of disfavored repair centers.

105.    Examples of this practice include advising that a particular chosen shop is not on the preferred provider list, advising that quality issues have arisen with that particular shop, that complaints have been received about that particular shop from other consumers, that the shop charges more than any other shop in the area and these additional costs will have to be paid  by the consumer, that repairs at the disfavored shop will take much longer than at other preferred shops and that the consumer will be responsible for rental car fees beyond a certain date, and that the Defendant cannot guarantee the work of that shop as it can at other shops.

106.    Such statements have been made about Plaintiff without any attempt to ascertain the truth thereof. Additionally, some of the ills recited, which implicitly criticize the shops, are wholly attributable to the insurer itself. The statement that repairs will take longer at a disfavored shop, for instance, is made without informing the insured that the delay in beginning repairs is due

to the Defendants' decision to delay sending an adjuster/appraiser to evaluate the damage, which is a decision that is completely and wholly within the control of the Defendants. Asserting that the shops charge more than other shops is often not a function of what the shop actually charges but is the result of the Defendants' refusal to pay, also a factor wholly and completely within the control of the respective Defendant. Yet each of the Defendants convey such statements to their insureds as problems that are entirely the fault of Plaintiff.

107.    The most egregious of these statements, that the Defendant cannot guarantee Plaintiff's work, is particularly misleading as none of the Defendants offer a guarantee for repair work. Instead, the Defendants require body shops to provide a limited lifetime guarantee on work performed. In the event additional work is required, Plaintiff is required to do so without any additional payment, or to indemnify the insurer for costs if work is performed at another shop.

108.    Thus, while it may be a facially truthful statement that an insurer cannot guarantee the work of a particular shop, the clearly understood  inference is that it can and will guarantee the work of another, favored shop, which is simply not true.

109.    The Defendants specifically and maliciously target Plaintiff as retribution for noncompliance with the fixed prices unilaterally imposed by the Defendants. The actions are intentional, improper and conducted with deliberate malice.

### **INTENTIONAL NATURE OF DEFENDANTS' CONDUCT**

110.    In 1963, a consent decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon complaint filed in the Southern District of New York. The allegations of that complaint included violations of Sections 1 and 3 of the

Sherman Act, also known as the Sherman Antitrust Act.  A copy of this Decree is attached hereto as Exhibit 4.

111.    Specific actions supporting those allegations included: (l) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts: (3) obtaining discounts on new replacement parts: (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused. The complaint further alleged a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

112.    The Consent Decree order provided the following relief: (1) enjoined the defendants from placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

113.    Whether or not any current Defendant is legally bound by this Decree, the actions described in the present cause fall squarely within those prohibited by the Decree.  The Decree has been "on the books" for fifty years and is well-known within the insurance industry.  Despite this, the Defendants have willfully ignored actual knowledge of the terms of the Consent Decree.

114.    Being known, it can only be said that Defendants were fully aware their actions, plans, programs, and combinations and/or conspiracy to effectuate the same prohibited actions have been willful, intentional and conducted with complete and reckless disregard for the rights of Plaintiff.

## CLAIMS FOR RELIEF

## COUNT I: VIOLATIONS OF THE SHERMAN ACT: PRICE-FIXING

115.    The Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade, 15 U.S.C. § 1. Such agreements are illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

116.    Through parallel actions, and/or explicit agreement, the Defendants have formed and engaged in a vertical conspiracy or combination to impose maximum price limits upon Plaintiff for their products and services.

117.    The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom  of traders and thereby restrain their ability to sell in accordance with their own judgment.  *Kiefer-Stewart Co. Vs.  Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

118.    The Defendants and co-conspirators have engaged in combination and conspiracy in unreasonable restraint of trade and commerce in the automobile damage repair industry.

119.    The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of these shops.

120.     Evidence of this conspiracy or combination include, but is not limited to, admission before witnesses that members of the insurance industry meet regularly to discuss such matters in and amongst themselves but refuse to allow members of the auto collision repair industry to attend those meetings, explicit statements by Defendants that they will conform to State Farm's unilaterally imposed payment structure, admitting the baseline application of the industry database but failing to conform to that minimum standard, followed by the uniformity of action by all Defendants.

121.     The aforesaid offenses have had, among others, the effect of eliminating competition within the automobile damage repair industry, elimination of some shops from a substantial segment of  the automobile damage repair industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, and subjecting repair shops to collective control and supervision of prices by the Defendants and co-conspirators.

122.     Neither Plaintiff, nor other members of the auto collision repair industry, are able to engage in competitive business practices as the Defendants have effectively and explicitly determined what their business practices will be.

123.     The Defendants' actions individually and certainly collectively have violated federal law and directly caused Plaintiff to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

## COUNT II: VIOLATIONS OF THE SHERMAN ACT: BOYCOTT

124.     The United States Supreme Court has repeatedly held that boycotts constitute a violation of the Sherman Act, 15 U.S.C. § 1. "'Boycott" has been defined within the antitrust law context as ''pressuring a party with whom one has a dispute by withholding, or enlisting others to

withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).

125.     The Defendants have engaged, and continue to engage, in boycott and boycotting activity through their repeated actions of steering customers away from Plaintiff through allegations and intimations of poor quality work, of poor efficiency in performing work, of questionable business practices, of overcharging, impugning integrity, and similar actions so as to withhold and/or enlist others to withhold patronage from Plaintiff.

126.     This boycott was specifically designed to pressure, intimidate, and/or coerce Plaintiff into complying with the maximum-price limitations unilaterally conceived by State Farm and agreed to collusively by the other Defendants.

127.     It is irrelevant for purposes of the Sherman antitrust boycott activity that Plaintiff and Defendants are not direct competitors within the same industry.  The United States Supreme Court has directly addressed this issue in *St. Paul Fire and Marine Insurance Company*, *supra*, stating, "[B]oycotters and the ultimate target need not be in a competitive relationship with each other."  438 U.S. at 543.

128.     The enlistment of third parties as a means of compelling capitulation by the boycotted group has long been viewed as conduct supporting a finding of unlawful boycott. Id.

129.     In the present matter, the Defendants have engaged in not only a boycott, but have regularly, routinely and purposefully enlisted the aid of unwitting third parties in carrying out their boycott through their intentional acts of steering those customers away from Plaintiff.

130.     Defendants' boycott was created and carried out with the sole purpose and intent of financially coercing and threatening Plaintiff into complying with the Defendants price caps.

131.    The Defendants actions are violation of federal law and have directly caused Plaintiff to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief requested herein is granted.

### COUNT III: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

132.    Tortious interference with a business relation occurs where a plaintiff has a valid contractual relationship or business expectancy, defendant knows of the relationship or expectancy, and defendant intentionally interferes with the relationship or expectancy causing a breach or termination that results in damages to the party whose relationship or expectancy has been disrupted. *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 6 (Ky. Ct. App. 2012); *National Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung,* 754 S.W.2d 855, 859 (Ky.1988).

133.    The Defendants, knowing of Plaintiff's valid business relations and prospective business relations, intentionally engaged in actions and a course of conduct designed to interfere with and injure Plaintiff's valid business relations and prospective business relations. The Defendants knowingly and intentionally steered and attempted to steer customers away from Plaintiff through their repeated campaign of misrepresentation of facts, failure to verify facts that damage or tend to cause damage to Plaintiff's business reputations before conveying the same to members of the public, implications of poor quality, poor efficiency, poor business ethics and practices, and unreliability.

134.    There is no justification for Defendants' conduct. But the purpose of these actions was twofold: to punish Plaintiff who complained about or refused to submit to the various oppressive and unilateral price ceiling the Defendants were enforcing upon them, and to direct

potential customers of Plaintiff to other vendors who would comply with the maximum price ceilings unilaterally imposed by the Defendants.

135.    Plaintiff has been damaged by the Defendants malicious and intentional actions. Plaintiff is therefore entitled to compensation for these damages.

### COUNT IV: UNJUST ENRICHMENT

136.    Unjust enrichment exists as a quasi-contractual obligation where a benefit was conferred on the defendant by the plaintiff at plaintiff's expense, that the benefit was appreciated by the defendant, and that the benefit was accepted by the defendant under such circumstances that it would be inequitable for it to be retained without payment of its value. *JP White, LLC v. Poe Companies, LLC*, No. 2010-CA-000267-MR, 2011 WL 1706751, at *5 (Ky. Ct. App. May 6, 2011) (*citing Jones v. Sparks,* 297 S.W.3d 73, 78 (Ky.App.2009)).

137.    Defendants' insureds and claimants entrusted Plaintiff with the full and complete repair of their vehicles, the cost of which it is incumbent upon the Defendants to pay. Plaintiff expects payment for all services performed to fulfill its obligation to fully and completely repair the vehicles of Defendants' insureds and claimants. Defendants have failed to pay for the proper and fair repair of those vehicles. An obligation was thus created to provide payment to Plaintiff for its work and expended materials.

138.    By failing to make payment and/or full payment for the necessary and reasonable costs of repair, Defendants have obtained or retained money which, in equity and good conscience, rightfully belongs to Plaintiff.

139.    There is no justification for Defendants retaining money that rightfully belongs to Plaintiff.

140.    There are no other appropriate remedies provided by law.

## COUNT V: QUANTUM MERUIT

141.    Quantum meruit rests upon the equitable principle that a party is not allowed to enrich itself at the expense of another. More specifically, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract therefore. *JP White, LLC v. Poe Companies, LLC*, No. 2010-CA-000267-MR, 2011 WL 1706751, at *4 (Ky. Ct. App. May 6, 2011).

142.    Plaintiff has performed valuable services and expended material resources with the reasonable expectation of payment and compensation for those services and materials. This is their business. Performing said services and expending material resources benefitted Defendants and Defendants' insured/claimants for whom Defendants are required to provide payment for repairs.

143.    It was and has always been foreseeable that Plaintiff were not performing labor or providing services and materials without expectation of full payment. However, Defendants have simply taken the position that payment may not be made unless they choose to provide it, regardless of any other factor or consideration and have thus enriched themselves at the expense of Plaintiff.

144.    Plaintiff is equitably entitled to receive payment for the materials and services rendered.

## COUNT VI: QUASI-ESTOPPEL

145.    The doctrine of quasi-estoppel is based on election, ratification, affirmance, acquiescence or acceptance of benefits and precludes a party from asserting a claim inconsistent with a position previously taken where it would be unconscionable to permit a person to maintain

a position inconsistent with one in which he acquiesced or one in which he accepted a benefit. *Weisbord/Etkin/Goldberg v. Gainesway Mgmt. Corp.*, No. 2007-CA-000280-MR, 2008 WL 820950, at *5 (Ky. Ct. App. Mar. 28, 2008) (*Pettit's Adm'r v. Goetz,* 261 Ky. 107, 87 S.W.2d 99, 102 (1935)).

146.    The Defendants have relied upon and asserted the validity and authority of the databases, discussed *supra*, when it has been to their respective advantage. Indeed, Defendant Safeco admitted outright it would abide by the minimum standards set out by the databases only when it was to their financial advantage. While Defendant Safeco has been the most candid about its inconsistent utilization of the databases, all Defendants have refused to compensate and/or fully compensate Plaintiff for materials expended and work performed, including labor and labor rates, upon reliance of these very same guides, claiming they are unnecessary to complete the work at hand.

147.    Defendants' inconsistent and contradictory application of, or refusal to abide by, the guidelines of the industry databases has created an atmosphere of doubt, uncertainty and distrust, all to the severe detriment of Plaintiff while, at the same time, seeking to obtain every improper advantage for Defendants themselves.

148.    Plaintiff therefore seek to have the Defendants estopped from denying the applicability and reasonableness of the baseline procedures and costs set forth in the industry databases henceforth and make full payment for the necessary reasonable costs of repairs made for the benefit of Defendants' insureds and claimants.

## COUNT VI: CONVERSION

149.     Plaintiff has performed necessary work and expended appropriate labor and materials for which Defendants have refused to make payment and/or full payment, even after demand for same.

150.     Conversion is defined as the wrongful exercise of dominion and control over property of another. *State Auto. Mut. Ins. Co. v. Chrysler Credit Corp.*, 792 S.W.2d 626, 627-628 (Ky. Ct. App. 1990).

151.     Defendants' action constitutes a conversion of Plaintiff's monies.

152.     Defendants are therefore wrongfully in possession of monies which should have been expended to pay repair bills of their policyholders and claimants, specifically set aside for that purpose, and which rightfully belongs to Plaintiff as a result of Plaintiff performing necessary reasonable and customary repairs to vehicles.

## PRAYER FOR RELIEF

153.     As a result of the Defendants' actions, Plaintiff has been substantially harmed and will continue to suffer unless the relief requested herein is granted.  Plaintiff therefore pray for the following relief:

A.     Compensatory damages for all non-payment and underpayment for work completed on behalf of the Defendants' insureds and claimants as determined by a jury.

B.     Compensation for the lost revenue through artificial suppression of labor rates as determined by a jury.

C.     Damages sufficient to compensate Plaintiff for lost business opportunities as determined by a jury.

D.     Treble damages, reasonable attorneys' fees and costs for violations of the Sherman Act, as required under 15 U.S.C. § 15.

E.     Injunctive relief prohibiting the Defendants from further engaging in any of the following:

    1.    Placing into effect any plan, program or practice which has the purpose or effect of:

        a)    directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff automotive  repair shop with respect to the repair of damage to automobiles.

        b)    fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

    2.    Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiff to participate in any parts procurement program.

    3.    Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

    4.    Prohibiting Defendant State Farm from altering or amending any of Plaintiff's responses to its market labor rate "survey" without the express written permission of Plaintiff.

F.      Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and deter each Defendant and similar entities from pursuing this improper conduct in the future.

G.      Pre- and post-judgment interest.

H.      Any additional relief the Court deems just and appropriate.

DATED:  November 5, 2014          FUTSCHER LAW PLLC

By s/*David A. Futscher*
David A. Futscher (KY82093)
913 N. Oak Drive
Villa Hills, KY  41017
Tel: (859) 912-2394
david@futscherlaw.com

BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.
Van Bunch
Eric Zard
2325 East Camelback Road, Suite 300
Phoenix, AZ  85016-3422
Tel:  (602) 274-1100
vbunch@bffb.com
ezard@bffb.com

Attorneys for Plaintiff